# In the United States Court of Federal Claims

No. 05-1054C
(Filed: August 19, 2011)

*************************************

| | |
|---|---|
| K-CON BUILDING SYSTEMS, INC., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |

*************************************

Motion for Summary Judgment; Contract to
Design and Build Prefabricated Building;
Enforceability of Liquidated Damages
Clause; Challenge to Components of the
Liquidated Damages Rate; Personnel Costs;
Constructive Suspension of Work;
Excusable Delay; Critical Path; Notice of
Changes; Existence of Changes

William A. Scott, Charleston, SC, for plaintiff.

Daniel B. Volk, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

SWEENEY, Judge

Plaintiff K-Con Building Systems, Inc. filed three suits in this court concerning its contracts with the United States Coast Guard ("Coast Guard") for the design and construction of prefabricated metal buildings in Elizabeth City, North Carolina, St. Petersburg, Florida, and Port Huron, Michigan. The three suits share many similarities, but there are meaningful differences that require the court to address each suit separately. The court previously ruled on plaintiff's motion for partial summary judgment in the Elizabeth City suit. In this case, which concerns the building in Port Huron, plaintiff moves for summary judgment on three issues: whether the liquidated damages rate specified in the contract constitutes an unenforceable penalty; whether remission of some liquidated damages is appropriate; and whether it is entitled to a change order. For the reasons set forth below, the court denies plaintiff's motion.

## I. BACKGROUND

In April 2001, the United States General Services Administration ("GSA") awarded plaintiff a Federal Supply Schedule contract for Prefabricated Structures and Outdoor Smoking Shelters.[1] Pl.'s App. 1-9. Subsequently, in the fall of 2003, the Coast Guard solicited proposals

---

[1] The court derives the facts in this section from plaintiff's complaint ("Compl."), plaintiff's amended complaint ("Am. Compl."), defendant's counterclaim ("Countercl."), the

for the design and construction of a prefabricated structure to serve as a cutter support team building in Port Huron.  Id. at 11-13, 82.

## A.  Contract Requirements

As set forth in the Scope of Services section of the request for proposals ("RFP"), the Coast Guard contemplated that the successful contractor would design the building based on the contract requirements, submit the design to the Coast Guard in three phases (a "50% design," a "90% design," and a "100% design"), and, upon the Coast Guard's approval of the 50% design, begin construction.  Id. at 85.  The 50% design was due twenty-one days after contract award, and the Coast Guard had five days within which to provide the contractor with its comments.  Id. The 90% design was due fourteen days after the contractor received the Coast Guard's comments on the 50% design, and the Coast Guard again had five days within which to provide the contractor with its comments.  Id.  The 100% design was due seven days after the contractor received the Coast Guard's comments on the 90% design.  Id.  The contractor was required to submit a proposed schedule reflecting these deadlines within fifteen days of commencing work on the project, and the design and construction of the building were to be completed no more than 300 days after contract award.  Id. at 20.

The Scope of Services section also contained the requirements for the design and construction of the building.  Id. at 82-90.  In the General Requirements subsection, the Coast Guard indicated that the building was to be "approximately 3276 gross square feet and [was] envisioned to be 36 feet by 91 feet," the building's shop bays were to have "a minimum clear height of ten (10) feet," and the contractor was to "[p]rovide code compliant structural, electrical, fire alarm, fire suppression, telecommunications, [heating, ventilation, and air conditioning ("HVAC"),] and plumbing" systems.  Id. at 82.  The Coast Guard supplied three drawings as "general conceptual layouts" for the contractor's reference.  Id.

The Coast Guard then identified more specific requirements in the Design Requirements subsection.  Several of these design requirements are of particular importance in the resolution of the pending motion.  First, in paragraph 2, the Coast Guard stated that the building was to provide "full and complete functionality in accordance with current standards for modern, IT compatible, shop and office facilities."  Id. at 83.  Second, in paragraph 2.1, the Coast Guard required that the contractor comply with specified building codes: "All spaces and components shall conform to the National Fire Code.  New construction shall comply with the International Building Code.  Mechanical systems shall comply with ASHRAE standards and equipment manufacturers guidelines.  Electrical design and construction shall conform to the latest edition of the NEC, NFPA [codes, and] TIA/EIA codes."  Id.  Next, in paragraph 2.3, the Coast Guard directed the contractor to provide a "two ton electric monorail hoist . . . ."  Id.  In paragraph 2.5,

_____

appendix filed with plaintiff's motion for partial summary judgment ("Pl.'s App."), and the appendix filed with defendant's opposition in response to plaintiff's motion for partial summary judgment ("Def.'s App.").

the Coast Guard mandated that the contractor provide a heating system that would maintain the temperature in the entire building between sixty-eight and seventy-two degrees Fahrenheit during the heating season and an air conditioning system that would maintain the temperature in the building, with the exception of the shops and mechanical spaces, between seventy-four and seventy-eight degrees Fahrenheit during the cooling season.  Id. at 83-84.  Finally, in paragraph 2.7.2, the Coast Guard indicated that "[a] small telecommunications equipment room of 8' x 7'" would meet its needs and that the contractor was to "[p]rovide a dedicated climate control" for that room.  Id. at 85.

## B.  Plaintiff's Proposal and Contract Award

Plaintiff initially responded to the solicitation on December 8, 2003.  Id. at 116.  The Coast Guard reviewed plaintiff's proposal and identified three concerns, including the fact that it "need[ed] climate control in the Telecommunications room as per the specifications."  Def.'s App. 23.  The contracting officer, Cathy Broussard, presented these concerns to plaintiff in an electronic-mail message and advised: "We . . . want to make sure you understand that you are responsible for the design/build process and must comply with our specification and drawings." Id.  A handwritten note on the printed message indicated that the three issues identified by the Coast Guard were "the only areas that need[ed] to be clarified–everything else complie[d] with the] spec[ifications]."  Id.

In response to the Coast Guard's concerns, plaintiff's sales manager, Skip Reitmeier, supplied Ms. Broussard with some additional information.  With respect to the telecommunications room, he stated:

> We had not included specific climate control for the Comm room in our pricing (again, in an effort to reduce cost).  However, our HVAC contractor recommends that the easiest and most cost effective way to accomplish it would be to install a Mitsubishi "mini-split system" specifically designed for computer and communications rooms.  This system would include a remote 2 ton condensing unit, electric heating element, and would be thermostatically controlled.

Id. at 24.  He explained that plaintiff was "confident" that it had "incorporated all of the performance requirements of the specifications" and that it had "endeavored to address" any "gray areas" by providing "qualifications" to its proposal.  Id.

Plaintiff submitted a revised proposal to the Coast Guard on January 13, 2004.  Pl.'s App. 116.  In its proposal, plaintiff indicated that it would perform the work as described, with the drawings and specifications provided by the Coast Guard serving only as guidelines.  Id.  Several aspects of plaintiff's proposal are relevant to the pending motion.  First, plaintiff proposed a building footprint of thirty-six feet by ninety-one feet, an eave height of twelve feet, and the installation of two "8' x 8' insulated sectional overhead doors . . . ."  Id. at 117-18.  With regard to the building's HVAC system, plaintiff proposed "two 60,000 BTU Trane 90% efficient split

system gas furnaces installed in the mechanical room" to heat and cool the building.  Id. at 118.
Finally, plaintiff indicated that the telecommunications room would also be heated and cooled
with this system, and would not have a dedicated climate control.  Id.  Plaintiff stated, however,
that its proposed HVAC system was "subject to change upon final engineering design and
requirements."  Id. at 119.

The Coast Guard accepted plaintiff's offer and placed an order under plaintiff's GSA
contract for the solicited building.  Id. at 11.  When Mr. Reitmeier returned the executed copy of
the contract to the Coast Guard, he attached a letter dated January 19, 2004, id. at 123, reiterating
plaintiff's position that its proposal would take precedence over the Scope of Services section in
the solicitation:

> As per our various conversations and e-mails regarding the above
> referenced solicitation and award, this writing will confirm that K-Con's pricing is
> predicated upon utilizing the Specifications and drawings provided by the Coast
> Guard as a performance guideline and that the clarifications outlined in our
> revised proposal dated 13 January 2004 define the Scope of Work to be
> undertaken by K-Con.  In the event of a discrepancy between the specifications
> and the proposed Scope of Work, the proposed Scope of Work will take
> precedence unless negotiated otherwise between K-Con and the Contracting
> Officer.

Id. at 122.  Ms. Broussard executed the contract on behalf of the Coast Guard on January 20,
2004, the award effective date.  Id. at 11.  The initial value of the contract was $582,641 and the
initial completion date was November 20, 2004.  Id.  Although the contract was modified on five
occasions, resulting in a final value of $529,271.47, the project completion date was never
extended.  Id. at 91-95.

### C.  Development of the Liquidated Damages Rate

Along with the standard clauses for changes and suspension of work, plaintiff's contract
with the Coast Guard contained a standard liquidated damages clause.  Id. at 30, 38.  The clause
provided for liquidated damages of $589 for each day that plaintiff failed to complete the
building beyond the contractually set completion date.  Id. at 30.  At the time the contract was
executed, the Coast Guard was bound by subpart 11.5 of the Federal Acquisition Regulation
("FAR"), which described the general parameters for the use of liquidated damages clauses.[2]
See, e.g., id. at 174, 179, 184, 192-93.  However, it was not subject to any regulations specifying
precisely how to determine an appropriate liquidated damages rate.  Id. at 168.  Further, the Coast
Guard had no settled policies or procedures concerning the determination of liquidated damages
rates.  Id. at 174, 192-93.  Rather, Ms. Broussard, prior to the solicitation of proposals for the

---

[2] All citations to the FAR refer to the version in effect on the date the Coast Guard placed
its order with plaintiff.

project, determined the appropriate rate using a methodology that the Coast Guard had utilized since at least 1997, the year she joined its contracting staff.  Id. at 96-97, 173-74, 192-93.

First, Ms. Broussard found that because the Coast Guard would "incur additional costs if the contractor" did not complete the work by the contract deadline and because it would be impossible to ascertain "[t]he extent or exact amount of damages" resulting from the contractor's failure to meet the deadline, it was appropriate to include a liquidated damages clause in the contract.  Id. at 96.  She then concluded that the rate of liquidated damages should be based on the "probable actual damages" that the Coast Guard would incur if the contractor breached the contract by failing to complete the work on time.  Id. (citing FAR 11.502).

Next, Ms. Broussard identified the extra costs that the Coast Guard would incur upon such a breach, breaking them down into two categories: "Travel/Per Diem, Inspection & Miscellaneous Costs" and "Administrative Costs for Government Representatives."  Id. at 96-97.  The first category included travel costs for the project manager and a member of the contracting staff, costs for the time of a construction inspector, and miscellaneous costs such as telephone and mail costs.  Id. at 96.  Ms. Broussard arrived at a total of $12,339 per month for this first category.[3]  Id.

The second category encompassed costs for the extra time that would be spent on the project by the Coast Guard personnel involved in the contract's administration and performance, as measured by the hourly rates for their services.  Id. at 97.  Ms. Broussard indicated that these costs were "[b]ased on the guidelines listed" in the following Coast Guard instruction: Standard Rates, Commandant Instruction 7310.1F (Jan. 20, 1999) ("COMDTINST 7310.1F").  Id.  According to its terms, the purpose of the instruction was to establish standard rates for use in computing reimbursable charges, i.e., the cost of services provided to other government agencies and the private sector that were recoverable pursuant to reimbursable agreements.  COMDTINST 7310.1F at 1.  However, because "[t]he 'direct' portion of the standard rates include[d] both fixed and variable costs," the rates were "not [to] be used to calculate . . . foreseeable costs related to contracting actions . . . ."  Id. at 2.  Among the standard rates described in the instruction were those for personnel services.  Id. at Enclosure (2).

Using the standard rates for personnel services contained in COMDTINST 7310.1F, Ms. Broussard calculated the annual cost for each Coast Guard employee and then multiplied those costs by a specified percentage that represented the amount of time the employee would spend on the project.  Pl.'s App. 97.  She estimated that the Construction Division chief, the Contracting Division chief, and the team leader would spend five percent of their time on the project, the project manager would spend thirty-three percent of his time on the project, and the contracting officer would spend ten percent of her time on the project.  Id.  These percentages were contained in the Coast Guard's preexisting template, and Ms. Broussard did not know their origin.  Id. at

---

[3] As explained below, Ms. Broussard may have miscalculated the total for the first category.

188-89, 192-93.  Ultimately, by dividing each annual amount by twelve, Ms. Broussard calculated monthly costs of $583 each for the Construction Division and Contracting Division chiefs, $478 for the team leader, $2,755 for the project manager, and $957 for the contracting officer, arriving at a total monthly cost of $5,356 for the second category.  Id. at 97.

As the final step of her process, Ms. Broussard divided the sum of the monthly costs for the two categories by thirty to calculate a daily liquidated damages rate of $590.[4]  Id.  At no point did Ms. Broussard make a specific written determination concerning the impact that a liquidated damages clause would have on pricing, competition, and contract administration.  Id. at 179, 192-93.  Nor did she document any consideration of the importance of the time of delivery or timely performance when determining that a liquidated damages clause was necessary.  Id. at 174, 192-93.

### D.  Contract Performance

Plaintiff received the documentation package for the project from the Coast Guard on January 27, 2004.  Id. at 123.  Because the package did not include a reference to his January 19, 2004 letter, Mr. Reitmeier sent an electronic-mail message to Ms. Broussard "to be certain that everyone involved [was] crystal clear that K-Con's performance" would "be in accordance with the clarifications outlined in [its] proposal and as defined in the referenced letter, and not in strict compliance with the specifications and/or drawings."  Id.  Ms. Broussard responded that she placed the January 19, 2004 "letter behind [her] award document and also put a note in the file in case [she was] not around that once [plaintiff] clarified [the Coast Guard's] concerns prior to the final proposal, [the Coast Guard] had no other concerns with [the] proposal conflicting with" the solicitation.  Id.

Around this same time, the Coast Guard was considering amending the contract to specify that the building needed to accommodate a small boat on a trailer.  Id. at 124-25.  It initially believed it would only be necessary to increase the height of the shop bays by four inches to make the accommodation.  Id. at 124; Def.'s App. 2.  Accordingly, on January 28, 2004, Ms. Broussard asked Mr. Reitmeier whether the proposed change could be accomplished at no additional cost to the Coast Guard.  Pl.'s App. 124.

Twelve days later, before plaintiff responded to the Coast Guard's inquiry, Eric Hanson, the Coast Guard's construction project manager, presented plaintiff with some additional proposed changes related to accommodating a boat in the building and inquired about their feasibility.  Id. at 126.  He indicated that the doors would need to be ten feet by twelve feet, that the building would need to be "bumped out in at least one direction" to provide space for a larger work bay, that the monorail hoist would need replacement with a two-ton bridge crane, and that the building would need to be designed to accommodate a boat's gasoline tank.  Id.

---

[4] As noted above, however, Ms. Broussard inserted a rate of $589 in the liquidated damages clause.  See Pl.'s App. 30.

Mr. Reitmeier responded to the Coast Guard's inquiries on February 16, 2004.  Id. at 129-30.  He represented that the Coast Guard's proposal would necessitate the following changes: a change in the building's eave height, additional masonry work and insulation due to the increased eave height, a change in the building's footprint, a size increase for the building's vehicle doors, the erection of fire walls, and the installation of a two-ton bridge crane.  Id. at 130.  He estimated that these changes would cost the Coast Guard an additional $59,257.  Id.

Two days later, Mr. Hanson informed Mr. Reitmeier that the Coast Guard's "next step" was to determine whether it wanted to incorporate the changes into the contract, a process that would be handled by a formal RFP and subsequent modification.  Id. at 128.  He further directed: "Please don't proceed on any of these items until notified by Cathy Broussard."  Id.  The same day, Ms. Broussard conveyed a similar message: "We are still trying to find funding for the customer requested changes for Port Huron.  Don't make the changes until I confirm funding and issue a change."  Id. at 127.  Mr. Reitmeier responded that plaintiff would "definitely not" make the changes and that nothing would happen until Ms. Broussard approved it with a modification. Def.'s App. 5.

The next day, Mr. Hanson informed Mr. Reitmeier that the Coast Guard was "inclined to modify the [building] to accommodate the larger boat bay and add the 2 hour fire wall but leave the hoist as specified."  Pl.'s App. 129.  He asserted that a "formal RFP" would follow.  Id.  That same day, Mr. Hanson advised his colleagues that plaintiff had not indicated that the proposed changes would impact the schedule, and that if there were schedule impacts, they would be "minimal" because plaintiff was "still working on the first design submittal."  Def.'s App. 4.

Despite the above correspondence, Ms. Broussard informed Mr. Reitmeier on March 1, 2004, that the Coast Guard would not be making any changes to the contract.  Pl.'s App. 131. She directed plaintiff to complete and submit its 50% design.  Id.  Based on the schedule outlined in the Scope of Services section of the contract, plaintiff was to have submitted the 50% design twenty-one days after contract award, which was February 10, 2004.  Id. at 85.  Ms. Broussard acknowledged that "we" might be "a little behind schedule," and requested that plaintiff advise her by March 8, 2004, when it would submit the 50% design.  Id. at 131.  Plaintiff did not respond by the deadline, leading Ms. Broussard to note the overdue 50% design and request an update.  Id. at 132.

Plaintiff met with the Coast Guard on March 18, 2004, to discuss the Coast Guard's concerns with plaintiff's progress.  Id. at 133.  At the meeting, the Coast Guard directed plaintiff to supply, within five days, an action plan for submitting the 50% design and completing the project by November 20, 2004, and noted that plaintiff's failure to submit the 50% design was "a condition that [was] endangering performance of the contract."  Id.  In response, plaintiff's project manager, Butch Clayton, indicated that plaintiff planned to submit a 35% design to the

Coast Guard on April 2, 2004.[5]  Def.'s App. 6.  Mr. Clayton attached a "tentative design schedule" to his response reflecting that plaintiff would begin working on the design on March 26, 2004, submit the 50% design on April 19, 2004, begin construction on May 13, 2004, submit a 70% design on May 14, 2004,[6] and submit the 100% design on June 4, 2004.  Id. at 6-7.

The Coast Guard received plaintiff's 35% design on April 6, 2004, and provided plaintiff with its review comments on April 13, 2004.  Pl.'s App. 134.  Of note were the following comments:

> Drawing A1 - FLOOR PLAN - CONSTRUCTION DETAILS:
>
> 1.  Overall building dimensions shall include provisions for minimum 1" air space between the inside face of the veneer brick and the sheathing.  If the 35' and 90' dimensions shown on the submittal are to the building system structural line (girt face or column face) as assumed, the air space between the OSB and the brick could not be more than 3/4".
>
> Drawing A1 - FLOOR PLAN and Drawing A2 ELEVATIONS:
>
>     . . . .
>
> 2.  Please provide small vision panels in the exterior doors leading from the Hall, MK Shop and Cutter Parts Storage (for safety and to prevent injury).
>
> 3.  Please provide a hose bib connection on the plan north and south faces of the building.

Id. at 135-36.  The Coast Guard also indicated that the design schedule provided by Mr. Clayton was insufficient to meet the contract's requirements, and directed plaintiff to submit a combined design and construction schedule by April 20, 2004.  Id. at 134.

Contrary to the schedule provided by Mr. Clayton, plaintiff failed to submit its 50% design by April 19, 2004.  Def.'s App. 16.  Nor did plaintiff submit the required combined design and construction schedule.  Id.  In a May 6, 2004 letter, Ms. Broussard indicated that the Coast Guard considered plaintiff's "failure to submit a proper progress schedule and failure to perform any work on site a condition that [was] endangering performance of [the] contract."  Id.  She also

---

[5]  There is no provision in the contract for the submission of a 35% design and no clear indication in the record why plaintiff proposed, and the Coast Guard subsequently accepted, a 35% design.

[6]  There is no provision in the contract for the submission of a 70% design and no clear indication in the record why plaintiff proposed a 70% design.

noted that plaintiff's failure to submit a 50% design resulted in plaintiff missing the deadline for the 90% design.  Id.  Ms. Broussard expressed the Coast Guard's concern that these missed deadlines might signal plaintiff's inability to complete the project by the November 20, 2004 deadline.  Id.  Responding to Ms. Broussard's letter, Mr. Clayton indicated that plaintiff's revised design and construction schedule reflected that it would submit the 50% design within ten working days and that it would complete the project by November 20, 2004.  Id. at 39.  Indeed, the attached schedule anticipated approval of the 50% design and receipt of the notice to proceed on May 28, 2004, delivery of the building to the project site on July 13, 2004, and completion of work by November 19, 2004.  Id. at 40-41.  The Coast Guard approved the proposed schedule. Id. at 27-28.

Electronic-mail messages on May 18, 2004, and May 20, 2004, reflected that plaintiff was in the process of incorporating the Coast Guard's review comments on the 35% design into the 50% design.  Id. at 26-27.  In fact, in the May 20, 2004 message, Mr. Clayton indicated that plaintiff planned to submit the 50% design the following day.  Id. at 27.  In neither message did plaintiff object to any of the Coast Guard's comments on the 35% design.  Id. at 26-27.

Plaintiff apparently submitted a 50% design sometime between May 21, 2004, and June 1, 2004.  Id. at 17, 27.  In its June 1, 2004 review comments, the Coast Guard indicated that plaintiff "failed to submit electrical and mechanical drawings in accordance with the Scope of Services" and that there were issues in the "civil and structural areas."  Id. at 17.  In a June 8, 2004 letter, Ms. Broussard stated that because plaintiff did not yet have an approved 50% design, the Coast Guard was concerned that plaintiff was not "making significant progress" on the project.  Id.  Mr. Clayton later informed Mr. Hanson that plaintiff was "working on" the Coast Guard's comments and averred that if the Coast Guard approved plaintiff's revised 50% design and issued the notice to proceed by June 25, 2004, plaintiff could complete the project by the November 20, 2004 deadline.  Id. at 38.

Plaintiff resubmitted its 50% design, and on June 30, 2004, the Coast Guard provided its review comments to plaintiff, id.; Pl.'s App. 137, several of which are relevant to the pending motion.  For example, the mechanical system reviewer commented:

| SHEET | ITEM # | COMMENT |
|-------|--------|---------|
| | . . . . | |
| M2 | 3 | Recommend isolation pads between the furnace and the framing. . . . |
| M2 | 4 | Louver detail: Recommend utilizing storm excluding louvers . . . in case of snow or rain penetration. |
| | . . . . | |

| | | |
|---|---|---|
| M3 | 8 | Although the toilet/locker areas can be treated as drawn, the following is recommended: Delete 20 [cubic feet per minute ("cfm")] supply air terminals going to the toilet areas of the men's and women's rooms; air can be drawn into this area via the undercut of the door (not sure why there is a full 7'x3' door).  Also, only need one exhaust fan to serve the entire toilet area running continuously. . . .  This would provide a less costly, and more conventional installation.  Additionally, it would be very difficult to balance 20 cfm in the toilet area with any accuracy. |
| M3 | 9 | Need to provide return from the multi-purpose room, the telecom room and the supervisor's room. |
| | . . . . | |
| M1 | 13 | Gas fired furnace schedule: schedule reflects 150 cfm of outside air.  This really needs to be increased to suit the total building exhaust plus provide a small percentage more for building pressurization.  Toilets, themselves, are exhausting 300 cfm. |

. . . .

General Comments:

1.  HVAC system shown on drawing does not conform with that proposed in K-Con's proposal letter of 8 December 2003, Revised 13 January 2004; Division 15 section indicated that the design was incorporating two 60,000 BTU Trane 90% efficient split system gas furnaces.  That shown on the drawing is a single furnace/air-handling system with two stage heating system.  Considering the harsh winter climates at Port Huron the two systems originally proposed would be the preferred method to treat the heating requirement (if one system goes down at least there is partial heat to keep the building tempered).

. . . .

3.  The [Coast Guard]'s specification specifically called for a dedicated climate control for the Telecomm room as dictated by [Maintenance and Logistics Command, Electronic Systems Division ("MLC(t)")].[7]  Somewhere down the line

---

[7]  See U.S. Coast Guard, U.S. Dep't of Homeland Sec., USCG: What's New, U.S. Coast Guard, http://www.uscg.mil/mlc/whats_new.asp (last visited June 20, 2011) (explaining that

the contractor determined that this was not required and has instead provided air directly off of the HVAC unit serving the rest of the building. While this will provide the conditioning really needed in the summer, it does little for the conditioning in the winter since it is pumping 100°F+ warm air into the space. This is unacceptable, as it can cause the telecommunications equipment to fail. The space must be maintained around 68-75°F, according to the (t) personnel to operate properly. It is recommended in lieu of providing air from the HVAC system directly, that conditioned air (summer and winter) be drawn from one of the surrounding areas via an inline supply fan and pressurize the Telecomm room. A door louver would be required to relieve the air. This will meet the intent of (t)'s requirements, and code requirements, and prevent equipment failure from any induced heat build-up.

Pl.'s App. 140-42 (footnote added). And, the telecommunications reviewer commented: "The door for the Telecomms Room will need to have a louvered partition. (See Mechanical General Comment No. 3)." Id. at 144. The Coast Guard approved plaintiff's 50% design "as noted." Id. at 137.

One week later, in a July 7, 2004 letter, Ms. Broussard informed plaintiff that based upon the Coast Guard's previous correspondence with plaintiff, the Coast Guard would be "holding 10% retainage on each invoice" plaintiff submitted, "until significant progress [was] made to enable [plaintiff] to get back on schedule and all required submittals [were] properly submitted." Def.'s App. 18. Indeed, Ms. Broussard returned plaintiff's third invoice, unprocessed, on July 8, 2004, noting: "[W]e will continue to withhold retainage until a revised schedule is received showing that you can complete the work on time, and all previous review comments are incorporated." Pl.'s App. 146.

Although the Coast Guard approved plaintiff's 50% design on June 30, 2004, it apparently did not issue a notice to proceed with construction at that time. In a July 8, 2004 electronic-mail message, Mr. Clayton indicated that the schedule he attached to the message was based on the Coast Guard's full approval of the 50% design and issuance of the notice to proceed by July 16, 2004. Def.'s App. 29. Notably, the schedule reflected that plaintiff anticipated delivery of the building on September 2, 2004, and completion of work by November 19, 2004. Id. at 31.

Mr. Clayton also attached plaintiff's responses to the Coast Guard's 50% design review comments to his message. Id. at 29. He noted that some of the comments had been incorporated into the 50% design and that others would be incorporated into the 90% design. Id. For almost all of the comments at issue in the pending motion, plaintiff either noted that it would comply with the comment or made no response whatsoever. Id. at 33-37. However, with respect to the

---

"MLC" refers to Maintenance and Logistics Command and "(t)" refers to MLC's Electronic Systems Division).

mechanical system general comment concerning the use of one furnace for the HVAC system, plaintiff remarked: "Due to the small size of the heating system for this space we recommend using just [one] system.  If the heating system fails then you could open the door to the adjoining space and blow air into the space.  Please discuss with contractor and advise."  Id. at 36.  In his message, Mr. Clayton requested that the Coast Guard review plaintiff's responses, indicate its concurrence, and issue the notice to proceed.  Id.  The Coast Guard eventually issued the notice to proceed and it appears that plaintiff began construction sometime before October 29, 2004, the date the building was delivered to the project site.  Id. at 49.

The beginning of construction did not, however, lay to rest the Coast Guard's concerns with plaintiff's design.  During an October 19, 2004 telephone conversation, Ms. Broussard noted that plaintiff's initial 90% design was incomplete and Mr. Clayton agreed to submit a complete 90% design within ten days.  Id. at 19.  Ms. Broussard also advised Mr. Clayton that plaintiff should not begin construction on any unapproved items.  Id.  Finally, Ms. Broussard addressed the possibility that based on plaintiff's September 9, 2004 schedule, plaintiff would not meet the November 20, 2004 deadline, and requested that Mr. Clayton furnish information explaining what steps plaintiff would take to get back on schedule.  Id.

In mid-November 2004, plaintiff provided the Coast Guard with another schedule, which indicated a project completion date of December 28, 2004.  Id. at 20.  In response, Ms. Broussard informed plaintiff:

> Despite your failure to complete the contract in the allotted time, I have determined it is in the Government's best interest to forbear from terminating your contract for default and permit you to continue work under the contract.  Continuation of performance is solely to mitigate damages and impacts to the Government and is not to be construed as a waiver of the Government['s] rights and remedies under the terms of the contract.  You will be assessed liquidated damages in the amount of $589.00 per day until all work is complete and beneficial occupancy has occurred.

Id.

Despite its agreement to submit a complete 90% design within ten days of October 19, 2004, plaintiff failed to do so.  Id. at 21.  Further, plaintiff represented to the Coast Guard that it would send the 90% design to the Coast Guard on November 15, 2004, and November 22, 2004, but failed to meet those deadlines.  Id.  In a December 1, 2004 letter, Ms. Broussard cautioned plaintiff that "any work completed prior to an approved design [would] be at [plaintiff's] own risk" because the Coast Guard was not obligated "to pay for unapproved work."  Id.  She further advised plaintiff that the Coast Guard would not process plaintiff's invoices until it received the 90% design and reminded plaintiff that since it had not met its November 20, 2004 deadline to complete the project, the Coast Guard was assessing liquidated damages of $589 per day until it

accepted the building.  Id.  Finally, she noted that if plaintiff did not cure the issues she raised within ten days, the contract was subject to termination by default.  Id.

Five days later, Mr. Clayton inquired about the assessment of liquidated damages.  Pl.'s App. 147.  Ms. Broussard responded that liquidated damages were part of the contract and would be "assessed accordingly."  Id.  She explained:

> You reference a letter of 19 January 2004 in which I cannot identify, however, your revised proposal of 13 January 2004 does identify specific technical sections within the Request for Proposal in which you took exception.  There was no mention of liquidated damages or any other contract requirements.  Upon resolution of those items listed in your letter of 13 January 2004, the contract was awarded.  Once awarded, it is not within your authority to exclude or take exception to our contract requirements.  You are bound by all the contract requirements and it will be enforced accordingly.

Id.

The Coast Guard ultimately declared the project to be substantially complete on May 23, 2005, and took possession of the building on that date.  Def.'s App. 1.  Overall, the Coast Guard paid plaintiff $412,885.62 of the contract's $529,271.47 value and assessed liquidated damages for 183 days of $107,787.  Pl.'s App. 154; Countercl. ¶ 27.

### E. Procedural History

Plaintiff filed a claim with Ms. Broussard on July 28, 2005, seeking payment of $118,950.68 that it alleged was wrongfully withheld on the contract.  Pl.'s App. 152.  It argued that the Coast Guard's refusal to pay the balance of the contract price and assessment of liquidated damages constituted a breach of contract.  Id.  Further, plaintiff contended that it:

> was not the sole cause of any alleged delays, any alleged delays by [it were] concurrent with delays caused by the government, the government failed to issue extensions to the completion date as a result of changes to the contract by the government, and the liquidated damages [were] an impermissible penalty.

Id.  Ms. Broussard denied plaintiff's claim on September 12, 2005, explaining that the Coast Guard's records reflected that plaintiff was "the sole cause of missing the contract completion date" and that there was no delay by the Coast Guard.  Id. at 153-54.  Thus, plaintiff filed suit in this court on September 30, 2005, seeking the remission of retained liquidated damages.  Compl. 2.  Defendant filed a counterclaim, alleging that the Coast Guard had withheld approximately $106,347 from payments to plaintiff as liquidated damages and seeking the balance of liquidated damages of $1,440.  Countercl. ¶¶ 28-29.

Plaintiff filed a second claim with Ms. Broussard on December 15, 2006, demanding, based on the contract's changes clause, "payment of $196,126.38 . . . for additional work and an extension until May 25, 2006 due to delays as a result of direction by the government" on the project. Pl.'s App. 156. Specifically, plaintiff contended that the Coast Guard delayed work at the beginning of the project while it considered whether to make changes to the contract specifications to allow the building to accommodate a small boat and trailer. Id. at 157. It also alleged that the Coast Guard made a variety of changes to the contract via its review comments on plaintiff's 35% and 50% designs. Id. at 158-59. Ms. Broussard denied plaintiff's claim on January 17, 2007, finding that there was no evidence to support its allegations. Id. at 164. With respect to the specific comments at issue in the pending motion, Ms. Broussard remarked that allowance of one-inch of air space in brick veneer walls and use of doors with vision panels were standard building practices. Id. at 163. She further indicated that installation of hose bib connections, isolation pads, storm-excluding louvers, and additional air returns and air intakes, as well as the noted air supply and exhaust adjustments to the toilet and locker areas, were standard building practices and in conformance with the International Building Code. Id. In addition, she noted that plaintiff identified the use of two furnaces in its proposal, and never provided justification for reducing the number of furnaces to one. Id. Finally, she stated that the use of a louvered partition in the telecommunications room was good design practice. Id.

Plaintiff filed an amended complaint on March 18, 2007, to add allegations related to its claim that the Coast Guard changed the contract without paying for the additional work or providing a time extension. Am. Compl. 2-3. On April 30, 2010, this case was reassigned to the undersigned. Upon the close of discovery, plaintiff filed the instant motion, and the court heard argument on August 17, 2011.

## II.  DISCUSSION

### A.  Motions for Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. R. Ct. of Fed. Cl. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. Id. at 324. Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence

of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  R. Ct. of Fed. Cl. 56(c)(1)(A).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party.  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, the court must not weigh the evidence or make findings of fact.  See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . ."), abrogated on other grounds by Egyptian Goddess, Inc. v. Swish, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); Ford Motor Co. v. United States, 157 F.3d 849, 854 (1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter.  Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues.").  Entry of summary judgment is mandated, "after adequate time for discovery," against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.

## B. Enforceability of Liquidated Damages Clauses

Plaintiff first seeks a ruling that the liquidated damages clause in its contract with the Coast Guard is unenforceable.  Liquidated damages are used "to allocate the consequences of a breach before it occurs," Jennie-O Foods, Inc. v. United States, 580 F.2d 400, 412 (Ct. Cl. 1978) (per curiam), which "save[s] the time and expense of litigating the issue of damages," DJ Mfg. Corp. v. United States, 86 F.3d 1130, 1133 (Fed. Cir. 1996).  Liquidated damages "serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts."  Priebe & Sons, Inc. v. United States, 332 U.S. 407, 411 (1947).  Thus, "[w]here parties have by their contract agreed upon a liquidated damages clause as a reasonable forecast of just compensation for breach of contract and damages are difficult to estimate accurately, such provision should be enforced."  Jennie-O Foods, Inc., 580 F.2d at 413-14; see also FAR 11.501 (noting that use of a liquidated damages clause is proper if damages "would be difficult or impossible to estimate accurately or prove" and that the "rate must be a reasonable forecast" of the anticipated damages).

On the other hand, courts will not enforce a liquidated damages clause when the amount of liquidated damages is "plainly without reasonable relation to any probable damage which may follow a breach," Kothe v. R.C. Taylor Trust, 280 U.S. 224, 226 (1930), or is "so extravagant, or so disproportionate to the amount of property loss, as to show that compensation was not the object aimed at or as to imply fraud, mistake, circumvention, or oppression," Wise v. United

States, 249 U.S. 361, 365 (1919).  In these circumstances, liquidated damages amount to a penalty.  Priebe & Sons, Inc., 332 U.S. at 413; United States v. Bethlehem Steel Co., 205 U.S. 105, 118-21 (1907).

When presented with a challenge to a liquidated damages clause, a court must judge the clause "as of the time of making the contract" and without regard to the amount of damages, if any, actually incurred by the nonbreaching party.  Priebe & Sons, Inc., 332 U.S. at 412; accord Bethlehem Steel Co., 205 U.S. at 119 (noting that courts will enforce liquidated damages clauses "without proof of the damages actually sustained"); Steve Kirchdorfer, Inc. v. United States, 229 Ct. Cl. 560, 565-67 (1981) (upholding an award of liquidated damages although no actual damages were sustained); Young Assocs., Inc. v. United States, 471 F.2d 618, 622 (Ct. Cl. 1973) ("It is enough if the amount stipulated is reasonable for the particular agreement at the time it is made.").  The party challenging a liquidated damages clause–typically, in government procurement cases, the contractor–bears the burden of proving that the clause is not a penalty. DJ Mfg. Corp., 86 F.3d at 1134; Jennie-O Foods, Inc., 580 F.2d at 414.  The burden is a heavy one "because when damages are uncertain or hard to measure, it naturally follows that it is difficult to conclude that a particular liquidated damages amount or rate is an unreasonable projection of what those damages might be."  DJ Mfg. Corp., 86 F.3d at 1134.  And because of this difficulty, it is generally improper for a court "to inquire into the process that the contracting officer followed in arriving at the liquidated damages figure that was put forth in the solicitation and agreed to in the contract."  Id. at 1137; see also id. at 1136 (noting that courts will enforce a liquidated damages clause, "regardless of how the liquidated damage figure was arrived at," if the amount of liquidated damages is reasonable).

In this case, plaintiff does not challenge the propriety of including a liquidated damages clause in its contract with the Coast Guard.[8]  Rather, in this phase of the litigation, it focuses on the reasonableness of the liquidated damages rate set forth in the clause, contending that a rate of $589 per day is a penalty because it "bears no reasonable relationship to any additional costs the [Coast Guard] could have reasonably anticipated in the event the Contract was delayed . . . ." Mot. 8.  Specifically, plaintiff argues that the Coast Guard's calculation of the liquidated damages rate was arbitrary and unsupported, and that some components of the rate should not have been included.

Before it addresses plaintiff's arguments, the court directs its attention to defendant's assertion that those arguments are untimely because a challenge of a liquidated damages clause is

---

[8]  Nevertheless, plaintiff notes that Ms. Broussard, before deciding to include a liquidated damages clause in the contract, did not (1) make specific findings concerning the potential impact that the use of a liquidated damages clause might have on pricing, competition, and contract administration or (2) document that she considered the importance of delivery time or timely performance.  Plaintiff implies that Ms. Broussard's failure to take these actions violated the FAR.  However, because plaintiff does not challenge the use of a liquidated damages clause in its contract with the Coast Guard per se, these particular facts are irrelevant.

permitted only at the time of contract formation.  As the court explains below, the case law defendant relies upon fails to support its position.

The principal decision upon which defendant relies is <u>P & D Contractors, Inc. v. United States</u>, 25 Cl. Ct. 237, <u>aff'd mem.</u>, 985 F.2d 583 (Fed. Cir. 1992).  In that case, the United States Claims Court ("Claims Court") held: "Reasonableness [of the liquidated damages] . . . is to be determined at the time of [contract] execution.  [The contractor] failed to argue the reasonableness of the liquidated damages at the time it executed the contract.  Therefore, [the contractor] is foreclosed from doing so now."[9]  <u>Id.</u> at 241 (citation omitted).  The court cited another decision from the Claims Court–<u>Cegers v. United States</u>–in support of its holding.  <u>Id.</u>  The Claims Court in <u>Cegers</u> "recognize[d] . . . the rule of law that the reasonableness of a stipulated liquidated damages amount should be determined at the time a contract is executed."  7 Cl. Ct. 615, 620 (1985).  As noted in <u>P & D Contractors, Inc.</u>, the <u>Cegers</u> court relied on the United States Supreme Court's ("Supreme Court") decision in <u>Priebe & Sons, Inc.</u> as the source of this "rule of law."

Accordingly, it is apparent that the legal principle advanced in <u>P & D Contractors, Inc.</u> can be directly traced back to <u>Priebe & Sons, Inc.</u>, in which, as noted above, the Supreme Court provided that a court must judge a liquidated damages clause "<u>as of</u> the time of making the contract."[10]  332 U.S. at 412 (emphasis added).  This binding precedent directs the court to

---

[9]  It bears noting that notwithstanding this statement, the Claims Court did, in fact, analyze whether the liquidated damages clause at issue was reasonable.  <u>See</u> <u>P & D Contractors, Inc.</u>, 25 Cl. Ct. at 240-41.  Indeed, earlier in the decision the court held that "the liquidated damages provision in this case, and the liquidated damages set out in NAVFAC P-68 on which it is based, [were] reasonable," <u>id.</u> at 240, and after it ruled on timeliness, it held that "the liquidated damages provision in this case [met] the reasonableness requirement . . . and, consequently, the provision was enforceable," <u>id.</u> at 241.  Thus, the timing of plaintiff's challenge was not the primary nor the sole reason for the court's upholding of the liquidated damages clause.

[10]  A similar situation is found in another decision relied upon by defendant, <u>Mega Construction Co. v. United States</u>, 29 Fed. Cl. 396 (1993).  In that case, the United States Court of Federal Claims provided that it was required to determine the reasonableness of liquidated damages "at the time the contract was executed rather than when the contract was breached or at some other subsequent time."  <u>Id.</u> at 502.  In support of this principle, the court cited <u>P & D Contractors, Inc.</u>, discussed above, and <u>United States v. Le Roy Dyal Co.</u>, 186 F.2d 460, 462 (3d Cir. 1951), which cites <u>Priebe & Sons, Inc.</u> for the proposition that "the [liquidated damages] provisions are to be judged as of the time of making the contract."  Thus, the court's statement and reasoning in <u>Mega Construction Co.</u> can also be traced back to <u>Priebe & Sons, Inc.</u> Moreover, the court's subsequent analysis of the contractor's challenge of the liquidated damages clause reveals that it was not concerned with the timeliness of the challenge, but with the conditions that existed at the time the parties executed the contract.  <u>See</u> <u>Mega Constr. Co.</u>, 29

examine the conditions that existed at the time of contract formation, but does not prevent the court from examining those conditions after a breach has occurred, which may be several years later.  Defendant has not cited any binding precedent that takes a contrary position.  Thus, to the extent that certain nonbinding decisions of the Claims Court might be construed to suggest that a liquidated damages clause may only be challenged at the time of contract formation, this court declines to follow that reasoning.

Returning to plaintiff's motion, the court first addresses plaintiff's assertion that the liquidated damages rate is arbitrary.  To support its view, plaintiff compares the rate to the rates in the Elizabeth City contract, the Elizabeth City reprocurement contract, and the St. Petersburg contract.  The table below summarizes the contents of the liquidated damages memoranda prepared by Ms. Broussard and another contracting officer prior to the Coast Guard's solicitation of proposals for each project:[11]

| Item of Liquidated Damages | Port Huron | Elizabeth City (original) | Elizabeth City (reprocurement) | St. Petersburg |
| --- | --- | --- | --- | --- |
| **Item 2: Monthly Travel/Per Diem, Inspection & Miscellaneous Costs** | | | | |
| **Travel to Job Site for Project Manager**[12] | $700 | $41 | $0 | $700 |

---

Fed. Cl. at 502 (holding that the contractor "did not demonstrate that the assessment of liquidated damages was unwarranted, contrary to law, or unreasonable in the light of the circumstances existing at the time the parties entered into the contract").

[11]  The table describes the "Item 2" and "Item 3" components of the liquidated damages rate.  There is no "Item 1" component; the first part of each liquidated damages memorandum contains the contracting officer's findings that a liquidated damages clause should be included in the contract.

[12]  Ms. Broussard indicated that the $700 figure for the Port Huron project was based on costs of $384 for the per diem, $105 for the car rental, and $300 for the airfare, which actually total $789.  Pl.'s App. 149.  She also indicated that the $700 figure for the St. Petersburg project was based on costs of $384 for the per diem, $105 for the car rental, and $243 for the airfare, which actually total $732.  Id. at 147.  Further, the $41 figure for the Elizabeth City project represented the cost of driving 120 miles at $0.34 per mile.  Id. at 145.

-18-

| | | | | |
|---|---|---|---|---|
| **Travel to Job Site for One Contracting Staff Member**[13] | $650 | $0 | $0 | $650 |
| **Construction Inspector Time** | $10,000 | $8,444 | $5,000 | $10,000 |
| **Miscellaneous Costs (mail, telephone, etc.)** | $200 | $200 | $200 | $200 |
| **Total for Item 2** | $12,339[14] | $8,685 | $5,200 | $11,550 |
| | | | | |
| **Item 3: Monthly Administrative Costs for Government Representatives** | | | | |
| **Construction Division Chief** | $583 | $583 | $583 | $583 |
| **Team Leader** | $478 | $513 | $513 | $478 |
| **Project Manager** | $2,755 | $3,386 | $3,386 | $2,755 |
| **Contracting Division Chief** | $583 | $583 | $583 | $583 |
| **Contracting Officer** | $957 | $1,026 | $1,026 | $957 |
| **Contracting Specialist** | n/a | $1,739 | $1,739 | n/a |
| **Total for Item 3** | $5,356 | $7,830 | $7,830 | $5,356 |
| | | | | |

---

[13]   Ms. Broussard indicated that the $650 figure for the Port Huron project was based on costs of $384 for the per diem and $300 for the airfare, which actually total $684.  Pl.'s App. 149.  She also indicated that the $650 figure for the St. Petersburg project was based on costs of $384 for the per diem and $243 for the airfare, which actually total $627.  Id. at 147.  In both memoranda, she indicated that she did not include car rental costs in the $650 figure because those costs were included in the project manager's travel cost.  Id. at 147, 149.

[14]   The basis for this figure is unclear as it is not the sum of $700, $650, $10,000, and $200, nor is it the sum of $789, $684, $10,000, and $200.

| Grand Total for Items 2 and 3 | $17,695 | $16,515 | $13,030 | $16,906 |
|---|---:|---:|---:|---:|
| Daily Rate | $590 | $551 | $434 | $564 |

See Pl.'s App. 96-103.

In its motion, plaintiff contends that Ms. Broussard and the other contracting officer, when determining the various components of the liquidated damages rates for the different projects, inconsistently and arbitrarily used different amounts for the same categories. Specifically, plaintiff complains about the inconsistencies in the "Construction Inspector Time" and "Travel to Job Site for One Contracting Staff Member" categories. With respect to the former category, plaintiff argues that there is no reasonable basis to assign $10,000 per month for inspection services in St. Petersburg and Port Huron, while assigning only $8,444 or $5,000 for inspection services in Elizabeth City. With respect to the latter category, plaintiff questions the inclusion of a contracting official in item 3 for the Elizabeth City project because there are no associated travel costs in item 2 for a contracting official, and also questions why a contracting official is required to travel to St. Petersburg and Port Huron, but not to Elizabeth City.

There are at least two difficulties with these contentions. First, the court cannot determine whether the value of a particular component of a liquidated damages rate is proper, e.g., whether "Construction Inspector Time" should be valued at $10,000, $8,444, or $5,000, based solely on the fact that different values were used for the component on different projects. It is plaintiff's burden to establish that the rate of liquidated damages is unreasonable. DJ Mfg. Corp., 86 F.3d at 1134. Moreover, plaintiff must establish that the rate is unreasonable for the particular contract that imposes the rate. Young Assocs., Inc., 471 F.2d at 622. Thus, if plaintiff's position is that a liquidated damages rate is unreasonable because a component of the rate is improper, it must prove that the component amount is improper as it relates to the particular contract at issue. In other words, it is plaintiff's burden to demonstrate that the Coast Guard could not have expected, at the time the parties executed the Port Huron contract, to spend $10,000 per month on inspection services if the project was delayed. Merely asserting that $10,000 per month is unreasonable because the Coast Guard used different amounts for different projects does not suffice.[15] The second difficulty is that the court's sole concern is whether the liquidated damages rate in the Port Huron contract is reasonable; consequently, a line-by-line comparison of the components of the rates described in liquidated damages memoranda prepared

---

[15] Moreover, plaintiff offers no explanation why a difference in the amount assigned for "Construction Inspector Time" for each project, in and of itself, is arbitrary. Merely because the assigned amounts are different for the various projects does not prove that the contracting officer lacked a rational reason for the difference. Indeed, the differences in the assigned amounts for the separate projects may be attributable to any number of reasons, including the scope, complexity, and location of each project, just to name three possibilities.

for other contracts provides little assistance.[16]  See id.  In sum, as a matter of law, the court must reject plaintiff's suggestions of arbitrariness.[17]

Plaintiff next challenges Ms. Broussard's inclusion of administrative costs as a component of the liquidated damages rate.  As described above, the challenged administrative costs are the costs for the time of the Coast Guard officials involved in the contract's administration and performance.  Plaintiff contends that because these officials would have received their pay and benefits regardless of the status of the contract, their pay and benefits could not be recovered as damages in the event of a breach, and therefore could not be a component of the liquidated damages rate.  Defendant responds that the Coast Guard properly included these costs as probable damages, explaining that if the contractor breached the contract, the specified Coast Guard officials would be required to spend more time and resources on the project than they originally anticipated.  This, in turn, would divert them from their work on other projects, which could ultimately result in the need to hire additional personnel.

The administrative costs about which plaintiff complains are a type of overhead.  See C.B.C. Enters., Inc. v. United States, 978 F.2d 669, 672 (Fed. Cir. 1992) ("Home office overhead includes the cost of such items as weekly payrolls [and] salaries . . . ."); see also FAR 31.105(d)(3) ("Costs incurred at the job site incident to performing the work, such as the cost of superintendence, timekeeping and clerical work, engineering . . . , etc., are allowable as direct or indirect costs . . . ."); FAR 31.205-6(a) ("Compensation for personal services is allowable . . . ."). There is no question that, as a general rule, a contractor can recover extended overhead as damages for government-caused delay.  See, e.g., Cmty. Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1581 (Fed. Cir. 1993) ("[A] government contractor may recover extended home office overhead during periods of government-caused delay."); George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 242 (2005) ("Extended field office overhead also may sometimes be recovered as delay damages.").  Thus, to the extent that a contractor can demonstrate that it incurred personnel costs as a result of the government's delay, it is entitled to recover them as delay damages.  See Cornell Wrecking Co. v. United States, 184 Ct. Cl. 289, 297-98 (1968) (per curiam) (allowing a contractor to recover the costs of the extra work done by a supervisor that resulted from the government's delay); Luria Bros. & Co. v. United States, 369 F.2d 701, 704-05

---

[16]  And, to the extent that a comparison of liquidated damages rates is appropriate, the court notes that the rates for each of the three original contracts fall within a $39 range, which may be evidence of consistency and nonarbitrariness, if not reasonableness.

[17]  As an aside, the court notes that plaintiff's concerns with the "Travel to Job Site for One Contracting Staff Member" category have little merit.  The court could reasonably conclude that a contracting official for the Elizabeth City project would travel to the project site in the same car as the project manager, thus obviating the need to assign travel costs for the contracting official.  This reasonable, common-sense supposition also demonstrates the likelihood that a contracting official was required to travel to the project sites in Elizabeth City, St. Petersburg, and Port Huron, and not just the latter two cities.

(Ct. Cl. 1966) (allowing a contractor to recover "field supervision" costs resulting from the government's delay); Wilner v. United States, 23 Cl. Ct. 241, 258-60 (1991) (allowing a contractor to recover field labor costs, i.e., costs for the "extra hours worked by plaintiff's superintendent," as well as extended home office overhead, i.e., the contractor's salary, resulting from the government's delay).  If a contractor can recover personnel costs as damages for delay, there is no reason to deny the government the same right.[18]

Nevertheless, plaintiff objects that the personnel costs included in the liquidated damages rate would remain unaffected by any delay it caused, and therefore there is no increase in overhead that could be attributable to such delay.  The court is not persuaded.  The identified Coast Guard officials would be required to perform additional work if plaintiff caused a delay.  This extra work has value that the Coast Guard is entitled to recover, and the pay and benefits of the officials charged with performing the additional work is a reasonable forecast of that value.

Moreover, there is no question that the Coast Guard is entitled to include administrative costs as a component of liquidated damages.  Jennie-O Foods, Inc., 580 F.2d at 413 ("Administrative expenses . . . may also be considered and they may be particularly difficult of accurate estimation."); Young Assocs., Inc., 471 F.2d at 621 (agreeing with the proposition that administrative expenses can be considered in calculating a liquidated damages rate); Cegers, 7

---

[18] In the course of advancing another argument, plaintiff appears to contend that because the Coast Guard was not prevented from pursuing work on other contracts and did not need to hire additional personnel due to the delayed completion of the Port Huron project, the Coast Guard is not entitled to recover personnel costs as damages.  In concurring with the judgment of the majority in Capital Electric Co. v. United States, Judge Friedman of the United States Court of Appeals for the Federal Circuit ("Federal Circuit") explicitly rejected such an argument:

> [The government] argues that since the delay in performance ordinarily does not increase the total amount of office overhead the contractor incurs in connection with the particular contract, but merely spreads it over a longer period, allowing the contractor to recover for such overhead for the period of delay would result in compensating the contractor for losses it did not actually incur.  According to the government, the only situations in which a contractor may recover for such extended office overhead is where the delay in performance: (1) requires the contractor to hire additional personnel or incur other additional expenses; or (2) prevents the contractor from taking on other work it would have been able to assume had there not been the delay.

> Although superficially plausible, the government's argument does not withstand more penetrating analysis based upon the theory on which extended office overhead is allowed as an element of delay damages.

729 F.2d 743, 747-48 (Fed. Cir. 1984) (Friedman, J., concurring).

Cl. Ct. at 619 ("Potential administrative expenses . . . may also be considered."). In fact, these administrative costs include the precise type of costs to which plaintiff objects. See Hogan Mech., Inc., ASBCA No. 21612, 78-1 BCA ¶ 13,164 (holding that personnel costs for engineers, contracting officials, lawyers, and clerical staff who were all "permanent employees" of the contracting agency and "would be used and paid regardless of whether [the contractor] completed its contract on time or late" were "properly the subject of a liquidated damages computation"). Accordingly, as a matter of law, the court rejects plaintiff's attempt to exclude the identified administrative costs from the Coast Guard's liquidated damages calculation.

Even if the administrative costs are properly included in the liquidated damages rate, argues plaintiff, the costs used by Ms. Broussard are flawed, and therefore do not reflect a reasonable forecast of the Coast Guard's damages. The first flaw plaintiff identifies concerns the percentages used by Ms. Broussard to calculate the amount of Coast Guard personnel resources attributable to the Port Huron project. Plaintiff contends that because Ms. Broussard did not know how the percentages had been derived originally, the percentages are unsupported and therefore unreasonable. The second flaw, according to plaintiff, is that Ms. Broussard based the administrative costs on a Coast Guard instruction that is not to be used as the basis for calculating liquidated damages rates. Plaintiff asserts that the express language of the instruction itself prohibits such a use. See COMDTINST 7310.1F at 2 (noting that the described standard rates "should not be used to calculate . . . foreseeable costs related to contracting actions"). The third flaw noted by plaintiff is that even if Ms. Broussard was entitled to base the administrative costs on the Coast Guard instruction, those rates improperly included the costs of overhead and benefits, which would have been incurred regardless of the status of the contract. The fourth flaw, plaintiff asserts, is that even if Ms. Broussard was entitled to use the rates in the Coast Guard instruction, she used the rates for services provided to nongovernmental entities rather than the rate applicable to services provided to the government.

None of the these purported flaws can provide the basis for challenging the liquidated damages rate set forth in the contract. The Federal Circuit has explained that so long as a liquidated damages rate is reasonable, a court should not "inquire into the process that the contracting officer followed in arriving at the liquidated damages figure that was put forth in the solicitation and agreed to in the contract." DJ Mfg. Corp., 86 F.3d at 1137. It necessarily follows that, to the extent that a particular component of a liquidated damages rate can be challenged, so long as the component amount is reasonable, the court should not examine how that amount was determined. In other words, there is no legal basis for the court to reject Ms. Broussard's use of particular percentages, reliance on a particular Coast Guard instruction, or use of particular rates from that instruction. And, plaintiff has provided no evidence that the monthly costs assigned by Ms. Broussard–$583 each for the Construction Division and Contracting Division chiefs, $478 for the team leader, $2,755 for the project manager, and $957 for the contracting officer–were unreasonable without regard to how those amounts were derived. All that plaintiff has contended is that Ms. Broussard improperly determined these costs. As a matter of law, such a contention is insufficient.

Plaintiff's contention that Ms. Broussard miscalculated the liquidated damages rate by $26.30 per day succumbs to the same analysis.[19]  As plaintiff notes, there does appear to be a miscalculation; the $12,339 total for the item 2 component–"Monthly Travel/Per Diem, Inspection & Miscellaneous Costs"–is not the sum of amounts listed for each separate element of item 2.  Nevertheless, so long as the liquidated damages rate is reasonable, the court will not look at the calculations behind it.  And, to the extent that the $12,339 amount can be challenged, so long as it is reasonable, the court will not look to how it was calculated.

Overall, plaintiff's legal arguments cannot support a challenge to the liquidated damages rate set forth in its contract with the Coast Guard.  As a result, plaintiff has failed to establish that the liquidated damages rate of $589 per day is an unreasonable forecast of the damages that the Coast Guard would sustain in the event of plaintiff's breach.  The contracted-for liquidated damages clause is therefore enforceable.  Thus, the court must address plaintiff's second contention–that it is entitled to a remission of liquidated damages due to a constructive suspension of work by the Coast Guard.

## C.  Constructive Suspension of Work

"Constructive suspension occurs when work is stopped absent an express order by the contracting officer and the government is found to be responsible for the work stoppage."  P.R. Burke Corp. v. United States, 277 F.3d 1346, 1359 (Fed. Cir. 2002).  "A constructive suspension has the same effect and consequences as an actual suspension, and relief should be granted as if an actual suspension order had been issued."  Fruehauf Corp. v. United States, 587 F.2d 486, 493-94 (Ct. Cl. 1978).

Plaintiff asserts that soon after the contract was awarded, the Coast Guard interfered with and constructively suspended work on plaintiff's design of the building by representing that it intended to amend the contract specifications to allow the building to accommodate a small boat on a trailer.  Plaintiff argues that as a result, it is entitled to a thirty-two day extension of the contract and the remission of liquidated damages for that same time period.  Plaintiff is not, however, seeking any damages for the alleged constructive suspension.

According to plaintiff, it is entitled to the relief it seeks under the contract's suspension of work clause.  The relevant portion of the clause provides:

(b)  If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's

---

[19]  Plaintiff arrives at a $26.30 daily miscalculation by summing the individual item 2 amounts set forth in the Elizabeth City liquidated damages memorandum ($700 + $650 + $10,000 + $200 = $11,550), subtracting that sum from the item 2 total in the memorandum ($12,339 - $11,550 = $789), and dividing the result by thirty days ($789 / 30 = $26.30).

failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for <u>any increase in the cost of performance of this contract</u> (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly.  However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

 (c)  A claim under this clause shall not be allowed–

  (1)  For <u>any costs</u> incurred more than 20 days before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved (but this requirement shall not apply as to a claim resulting from a suspension order); and

  (2)  Unless the claim, <u>in an amount stated</u>, is asserted in writing as soon as practicable after the termination of the suspension, delay, or interruption, but not later than the date of final payment under the contract.

FAR 52.242-14 (emphasis added), <u>cited in</u> Pl.'s App. 38.  A plain reading of the clause indicates that it cannot form the basis for the relief requested by plaintiff.  The suspension of work clause allows for the recovery of increased costs of performance, but not time extensions or the remission of liquidated damages.  <u>Cf.</u> <u>Merritt-Chapman & Scott Corp. v. United States</u>, 528 F.2d 1392, 1396 (Ct. Cl. 1976) (noting that the suspension of work clause was implemented in response to the Supreme Court's holding that the exclusive remedy for government-caused delays under "Changes," "Changed Conditions," and "Delays-Damages" clauses was a time extension).  Indeed, the language of the clause contrasts with the language in the contract's differing site conditions clause and changes clause, both of which allow for the recovery of an increase "in the Contractor's cost of, or the time required for," contract performance.  <u>See</u> FAR 52.236-2 (differing site conditions), <u>cited in</u> Pl.'s App. 38; FAR 52.243-4 (changes), <u>cited in</u> Pl.'s App. 38.  Because plaintiff is not seeking money damages under the suspension of work clause, the court treats plaintiff's claim as one of excusable delay.[20]

## D.  Excusable Delay

 Federal procurement law provides that the government cannot assess damages against a contractor for a failure to timely complete work under a contract if "[t]he delay in completing the work arises from unforeseeable causes," such as acts of the government, that are "beyond the

---

[20]  The court similarly disregards those arguments by defendant that rely on the suspension of work clause.

control and without the fault or negligence of the Contractor."  FAR 52.249-10(b)(1).  To result in an excusable delay, "the unforeseeable cause must delay the overall contract completion; i.e., it must affect the critical path of performance."[21]  Sauer Inc. v. Danzig, 224 F.3d 1340, 1345 (Fed. Cir. 2000).  A contractor seeking the remission of liquidated damages on account of excusable delay bears the burden of proving "the extent of the excusable delay to which it is entitled."  Id. at 1347.

The record reflects the following pertinent facts: Eight days after plaintiff was awarded the contract, the Coast Guard inquired whether changes to accommodate a small boat and trailer could be made at no cost.  Twelve days later, the Coast Guard inquired about the feasibility of some additional changes.  Plaintiff responded seven days later, indicating that the Coast Guard's proposal would necessitate the following changes: a change in the building's eave height, additional masonry work and insulation, a change in the building's footprint, a size increase for the building's vehicle doors, the erection of fire walls, and the installation of a two-ton bridge crane.  Two days after that, the Coast Guard informed plaintiff that it would consider the proposed changes and cautioned plaintiff not to proceed with the changes until notified to do so.  Plaintiff indicated its understanding.  The following day, the Coast Guard informed plaintiff that it was inclined to enlarge the building and add the fire walls.  Nevertheless, eleven days later, the Coast Guard advised plaintiff that it would not be making any changes and noted that contract performance might be slightly behind schedule.  The first proposed schedule plaintiff submitted to the Coast Guard indicated that it would begin to design the building twenty-five days from the date it was informed that there would be no changes to the contract specifications.

---

[21]  The United States Court of Claims described the critical path concept in the following manner:

> [T]he critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work.  (E.g., one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.)  The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project.  Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project.  However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed.  These latter items of work are on the "critical path."  A delay, or acceleration, of work along the critical path will affect the entire project.

Haney v. United States, 676 F.2d 584, 595 (Ct. Cl. 1982); accord Wilner v. United States, 24 F.3d 1397, 1399 n.5 (Fed. Cir. 1994) (en banc).

Plaintiff contends that the Coast Guard's announced intention to make significant changes to the contract specifications soon after it awarded the contract suspended contract performance because plaintiff could not proceed with its design without incurring substantial costs and inviting a claim for a failure to mitigate damages. In response, defendant argues that there was no suspension of performance because the Coast Guard directed plaintiff to avoid making any design changes until the contract was modified, that plaintiff was responsible for some of the delay because it did not begin work on the building's design for at least three weeks after being informed that there would be no change, that the Coast Guard's initial inquiry about whether a change could be made at no cost should not have delayed plaintiff's design, and that plaintiff failed to demonstrate that the Coast Guard's purported delays were on the contract's critical path.[22] Defendant's last argument trumps consideration of every other argument advanced by the parties.

Contrary to plaintiff's contentions, unambiguous binding precedent requires a contractor asserting an excusable delay to demonstrate that the delay occurred on the critical path. See Sauer Inc., 224 F.3d at 1345. Plaintiff's rejection of this requirement no doubt led to its failure to address whether the Coast Guard's purported suspension of contract performance pending a change in the contract's specifications affected the overall contract completion. Regardless of the reason for the omission, plaintiff's failure to offer proof on an essential element of its claim of excusable delay is fatal to its motion. Thus, the court cannot rule in plaintiff's favor on the issue of the remission of retained liquidated damages at this time.

## E. Changes

In addition to requesting the remission of retained liquidated damages, plaintiff seeks a ruling from the court that it is entitled to a change for each of the Coast Guard's comments that imposed a requirement not included in the contract's Scope of Services section. Although it addressed a number of comments that it believed to be changes in the second claim it submitted to Ms. Broussard, plaintiff focuses its attention, for the purposes of the pending motion, on what it contends are the comments that indisputably contained requirements that plaintiff perform work not specified in the contract. Three of these comments were made by the Coast Guard in response to plaintiff's 35% design and concerned an increase in air space in the building's walls to one inch, the use of vision panels in certain doors, and the provision of hose bib connections. The remaining comments were made by the Coast Guard in response to plaintiff's 50% design and concerned the recommended use of isolation pads and storm-excluding louvers, the

---

[22] Defendant also contends that because the Coast Guard never issued a change order, plaintiff's motion fails to the extent it relies upon the contract's changes clause. Plaintiff, however, does not rely on the changes clause in seeking the remission of liquidated damages. Rather, it is contending that the Coast Guard's suggestions that it intended to make a change to the contract specifications effectively suspended contract performance. Defendant's argument is, therefore, baseless.

recommended adjustments to the air supply and exhaust in the toilet and locker areas, the addition of air returns to three rooms, the provision of additional air intakes, the use of two furnaces instead of one, and the use of a louvered partition in the telecommunications room as part of a recommended adjustment to the HVAC system.  Plaintiff further asserts that these review comments were changes based on Ms. Broussard's July 8, 2004 letter notifying plaintiff that the Coast Guard would withhold a retainage from its payments until plaintiff incorporated all of the review comments into the building's design.

### 1.  Notice of the Purported Changes

Plaintiff contends that it is entitled to a change for each purported extracontractual requirement contained in the Coast Guard's comments pursuant to the contract's changes clause, which provides:

(b)  Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; Provided, that the Contractor gives the Contracting Officer written notice stating–

(1)  The date, circumstances, and source of the order; and

(2)  That the Contractor regards the order as a change order.

(c)  Except as provided in this clause, no order, statement, or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.

(d)  If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing.  However, . . . no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required.  . . .

(e)  The Contractor must assert its right to an adjustment under this clause within 30 days after . . . the furnishing of a written notice under paragraph (b) of this clause, by submitting to the Contracting Officer a written statement describing the general nature and amount of the proposal, unless this period is extended by the Government.  The statement of proposal for adjustment may be included in the notice under paragraph (b) of this clause.

FAR 52.242-14, cited in Pl.'s App. 38.  Defendant argues that plaintiff cannot recover for the purported changes because it did not satisfy the clause's notice requirements.

Although the changes clause describes a twenty-day time limit for providing notice to the contracting agency, the general rule described in the case law for evaluating compliance with the clause's notice requirement is more flexible: "Written notice as to constructive changes must be supplied by the contractor before such time that the Government would suffer if not apprised of the facts."  Calfon Constr., Inc. v. United States, 18 Cl. Ct. 426, 438 (1989), aff'd on other grounds, 923 F.2d 872 (Fed. Cir. 1990) (unpublished table decision); accord Hoel-Steffen Constr. Co. v. United States, 456 F.2d 760, 767-68 (Ct. Cl. 1972) ("To adopt [a] severe and narrow application of the notice requirements, . . . would be out of tune with the language and purpose of the notice provisions, as well as with this court's wholesome concern that notice provisions in contract-adjustment clauses not be applied too technically and illiberally where the Government is quite aware of the operative facts.").  Thus, "[i]f the contracting officials have knowledge of the facts or problems that form the basis of a claim and are able to perform necessary fact-finding and decisionmaking, the Government is not prejudiced by the contractor's failure to submit a precise claim at the time a constructive change occurs."  Calfon Constr., Inc., 18 Cl. Ct. at 438-39.  Conversely, "[w]here contractor silence would foreclose less costly alternative solutions or the ability of the Government to avoid contractor claims, timely notice is required."  Id. at 439.

In light of this standard, defendant contends that plaintiff never informed the Coast Guard that it believed that the review comments, or the direction to incorporate the review comments into the design, constituted changes to the contract's requirements.  To the contrary, defendant asserts, plaintiff raised no objections when informing the Coast Guard that it was incorporating the 35% design review comments into the 50% design.  And, notes defendant, plaintiff responded to the 50% design review comments by indicating that many of the comments would be incorporated into the design or by making no response at all.  Defendant therefore argues that plaintiff cannot proceed on its claim for a change.[23]

Plaintiff's position, as clarified during oral argument, is that because the Coast Guard threatened to withhold payment unless plaintiff incorporated the Coast Guard's comments into the design, plaintiff's ability to move forward with the project was held hostage by the Coast Guard.  According to plaintiff, informing the Coast Guard that it considered any extra work described in the comments to be a change to the contract would have been fruitless; rather, its only option was to note that it would comply with the comments and proceed with the work.  Moreover, argues plaintiff, the Coast Guard was not prejudiced by any lack of notice because had

_____

[23]  Defendant specifically argues that plaintiff's "claim for a retroactive change to the contract should be extinguished."  Def.'s Opp'n 23.  However, defendant did not file a cross-motion for summary judgment seeking dismissal of the claim.  The court declines to convert defendant's opposition brief into a motion for summary judgment.  Thus, the court will not dismiss plaintiff's claim.

plaintiff objected, the Coast Guard would have directed plaintiff to incorporate its comments into the design.

The court concludes that there is a genuine issue of material fact as to whether the Coast Guard had sufficient notice that plaintiff considered the 35% and 50% design review comments to constitute changes to the contract.  On one hand, there is evidence suggesting that the Coast Guard, by directing plaintiff to incorporate the comments into the design, knew that it was making changes to the contract.  On the other hand, there is evidence suggesting that the Coast Guard, presented with plaintiff's statements that it was incorporating the review comments into the design, was not aware that plaintiff considered those comments to be changes.  Accordingly, the court cannot rule in plaintiff's favor on the issue of notice at this stage of the proceedings.

## 2.  Existence of Changes

Although it is not necessary for the resolution of plaintiff's motion, the court finds it beneficial to determine, assuming that the notice requirement has been satisfied, if genuine issues of material fact exist regarding whether the review comments identified by plaintiff constituted changes to the contract.  The court addresses each of the ten comments challenged by plaintiff in the pending motion, either in groups or individually.

### a.  35% Design Review Comments: One-Inch Air Space and Vision Panels

Three of the Coast Guard's comments to plaintiff's 35% design are at issue.  Two of those comments may be analyzed in the same manner.  They are: (1) "Overall building dimensions shall include provisions for minimum 1" air space between the inside face of the veneer brick and the sheathing" and (2) "Please provide small vision panels in the exterior doors leading from the Hall, MK Shop and Cutter Parts Storage (for safety and to prevent injury)." Pl.'s App. 135-36.  In her decision rejecting plaintiff's second claim, Ms. Broussard explained that the Coast Guard made these comments to ensure compliance with standard building practices.

Plaintiff argues that neither comment describes a contract requirement and both, therefore, are changes to the contract.  Defendant responds that these comments were not changes, but reminders to plaintiff that it needed to comply with all relevant building standards, as reflected in Ms. Broussard's decision.  Plaintiff replies that defendant does not provide any evidence–in affidavit form or otherwise–supporting the contention that the comments described standard building practices.  Thus, plaintiff argues, defendant's response is insufficient to create a genuine issue of material fact.

In essence, plaintiff contends that the contract did not require it to conform with standard building practices.  Plaintiff, however, ignores the express contract provision requiring compliance with "current standards for modern, IT compatible, shop and office facilities."  Id. at 83.  Thus, any comments made by the Coast Guard to ensure compliance with "current

standards" are not extracontractual requirements.  Because plaintiff fails to aver, as an undisputed fact, that the one-inch air space and vision panel requirements, described by Ms. Broussard as standard building practices, are not "current standards," the court concludes that there is a genuine issue of material fact as to whether the requirements amount to changes.

### b.  35% Design Review Comment: Hose Bib Connections

The third comment on the 35% design challenged by plaintiff is: "Please provide a hose bib connection on the plan north and south faces of the building."  Id. at 136.  In denying plaintiff's second claim, Ms. Broussard explained that the Coast Guard made this comment to ensure compliance with standard building practices and the International Building Code. Plaintiff argues, as it did with the other 35% design review comments, that the contract did not require the installation of hose bib connections.  Defendant again responds that this comment was not a change, but a reminder to plaintiff that it needed to comply with all relevant building standards, as explained by Ms. Broussard in her decision.  Plaintiff replies that defendant does not provide any evidence supporting the contention that the comments described standard building practices or requirements in the International Building Code.  Thus, plaintiff argues, defendant's response is insufficient to create a genuine issue of material fact.

With respect to the International Building Code, defendant countered plaintiff's contention that the code does not require hose bib connections with Ms. Broussard's explanation, from her decision on plaintiff's second claim, that it does require hose bib connections.  This evidence is sufficient to create a genuine issue of material fact.  In ruling on a motion for summary judgment, the court must not weigh the evidence or find facts.  See Anderson, 477 U.S. at 249.  Accordingly, it is unnecessary for defendant to present the court with the specific provision of the International Building Code concerning hose bib connections at this time. Furthermore, because plaintiff fails to aver, as an undisputed fact, that the hose bib connection requirement, described by Ms. Broussard as a standard building practice, is not a "current standard," the court concludes that there is a genuine issue of material fact as to whether the requirement amounts to a change.

### c.  50% Design Review Comments: Isolation Pads, Storm-Excluding Louvers, and the Toilet and Locker Areas

In addition to challenging the Coast Guard's comments on its 35% design, plaintiff contends that seven comments on its 50% design constituted changes.  Three of the mechanical system comments may be reviewed together.  The first of these comments is: "Recommend isolation pads between the furnace and the framing."  Pl.'s App. 140.  The second comment is "Louver detail: Recommend utilizing storm excluding louvers . . . in case of snow or rain penetration."  Id.  And, the third comment is:

> Although the toilet/locker areas can be treated as drawn, the following is
> recommended:  Delete 20 cfm supply air terminals going to the toilet areas of the

men's and women's rooms; air can be drawn into this area via the undercut of the
door (not sure why there is a full 7'x3' door).  Also, only need one exhaust fan to
serve the entire toilet area running continuously.  . . .  This would provide a less
costly, and more conventional installation.  Additionally, it would be very difficult
to balance 20 cfm in the toilet area with any accuracy.

Id. at 140-41.  In rejecting plaintiff's second claim, Ms. Broussard explained that the Coast
Guard made these comments to ensure compliance with standard building practices and the
International Building Code.

Plaintiff argues that none of these comments describes a requirement found in the
contract or in the building code and therefore they all constitute changes.  The court concludes
that plaintiff cannot prevail on this issue for three reasons.  First, each of these requirements is
couched as a recommendation, not as a directive.  Plaintiff offers no explanation why this
language does not defeat its argument.  Second, Ms. Broussard's statement that these comments
were meant to ensure compliance with the International Building Code sufficiently rebuts
plaintiff's contention otherwise.  Third, plaintiff fails to aver, as an undisputed fact, that the
recommendations in these comments, described by Ms. Broussard as standard building practices,
are not "current standards."  Thus, the court finds that there is a genuine issue of material fact as
to whether these comments constitute changes.

### d.  50% Design Review Comments: Air Returns and Air Intakes

The next two comments challenged by plaintiff concern the addition of air returns and air
intakes to the design.  Specifically, they are: (1) "Need to provide return from the multi-purpose
room, the telecom room and the supervisor's room" and (2) "Gas fired furnace schedule:
schedule reflects 150 cfm of outside air.  This really needs to be increased to suit the total
building exhaust plus provide a small percentage more for building pressurization.  Toilets,
themselves, are exhausting 300 cfm."  Id. at 141.  Ms. Broussard later explained, when denying
plaintiff's second claim, that the Coast Guard made these comments to ensure compliance with
standard building practices and the International Building Code.

Plaintiff argues that neither comment describes a requirement found in the contract or the
building code and therefore both constitute changes.  Applying the same analysis it used for the
35% design comments regarding whether they describe "current standards" or code requirements,
the court finds that there is a genuine issue of material fact as to whether these comments
constitute changes.

### e.  50% Design Review Comment: Furnaces

The final mechanical system comment challenged by plaintiff is:

HVAC system shown on drawing does not conform with that proposed in K-Con's proposal letter of 8 December 2003, Revised 13 January 2004; Division 15 section indicated that the design was incorporating two 60,000 BTU Trane 90% efficient split system gas furnaces.  That shown on the drawing is a single furnace/air-handling system with two stage heating system.  Considering the harsh winter climates at Port Huron the two systems originally proposed would be the preferred method to treat the heating requirement (if one system goes down at least there is partial heat to keep the building tempered).

Id.  In rejecting plaintiff's second claim, Ms. Broussard explained that the Coast Guard made this comment because plaintiff indicated that it would use two furnaces in its proposal, and never provided the Coast Guard with justification for reducing the number of furnaces from two to one.

Plaintiff argues that with its comment, the Coast Guard directed plaintiff to install two furnaces even though it was not required to do so under the contract.[24]  Defendant responds that the comment merely identifies the Coast Guard's preference for the plan described in plaintiff's proposal, but contains no direction that plaintiff install two furnaces.  Defendant is correct that the comment is couched as a preference rather than as a requirement.  Further, Ms. Broussard's decision on plaintiff's second claim reinforces the Coast Guard's view, as reflected in the comment at issue, that plaintiff was diverging from its proposal.  Accordingly, the court finds that there is a genuine issue of material fact as to whether this comment constitutes a change.

------------------------------------------------------------

[24]  Plaintiff cannot have it both ways.  On one hand, in its January 19, 2004 letter, it informed the Coast Guard of its position that its proposal would take precedence over the Scope of Services section in the solicitation.  See Pl.'s App. 122 ("In the event of a discrepancy between the specifications and the proposed Scope of Work, the proposed Scope of Work will take precedence unless negotiated otherwise between K-Con and the Contracting Officer."), 123 (verifying, in a follow-up electronic-mail message, "that everyone involved [was] crystal clear that K-Con's performance" would "be in accordance with the clarifications outlined in [its] proposal and as defined in the referenced letter, and not in strict compliance with the specifications and/or drawings").  On the other hand, it argues here that the contract, not its proposal, controls.  Because neither party addresses whether plaintiff is bound by the contract specifications or its proposal, the court does not reach the issue at this time.  To the extent that it is relevant to determining whether the Coast Guard's gas furnace comment imposed an extracontractual requirement, the court will decide the issue after trial.

**f.  50% Design Review Comment: Telecommunications Room Partition Louver**

The final comment challenged by plaintiff is: "The door for the Telecomms Room will need to have a louvered partition.  (See Mechanical General Comment No. 3)."  Id. at 144.  The mechanical system comment to which it refers provides:

> The [Coast Guard]'s specification specifically called for a dedicated climate control for the Telecomm room as dictated by MLC(t).  Somewhere down the line the contractor determined that this was not required and has instead provided air directly off of the HVAC unit serving the rest of the building.  While this will provide the conditioning really needed in the summer, it does little for the conditioning in the winter since it is pumping 100°F+ warm air into the space. This is unacceptable, as it can cause the telecommunications equipment to fail. The space must be maintained around 68-75°F, according to the (t) personnel to operate properly.  It is recommended in lieu of providing air from the HVAC system directly, that conditioned air (summer and winter) be drawn from one of the surrounding areas via an inline supply fan and pressurize the Telecomm room. A door louver would be required to relieve the air.  This will meet the intent of (t)'s requirements, and code requirements, and prevent equipment failure from any induced heat build-up.

Id. at 142.  Ms. Broussard explained, when denying plaintiff's second claim, that the Coast Guard recommended HVAC changes to the telecommunications room because plaintiff's proposed method of heating the room would likely cause the temperature in the room to rise above the range specified in the Scope of Services section of the contract, and that adding a louvered partition would be a good design practice.

Plaintiff argues that the Coast Guard's comment regarding the louvered partition does not describe a contract requirement and is, therefore, a change.  It ignores the fact, however, that the comment was made in conjunction with another comment regarding the heating of the telecommunications room, and that this other comment was couched in terms of a recommendation to ensure compliance with the specifications, rather than as a requirement. Accordingly, the court finds that there is a genuine issue of material fact as to whether this comment constitutes a change.

### 3.  Summary

The court concludes that there is a genuine issue of material fact with respect to whether plaintiff provided the Coast Guard with adequate notice regarding the alleged contract changes. Further, to the extent that plaintiff has provided the Coast Guard with adequate notice, there are genuine issues of material fact concerning whether the comments identified by plaintiff changed the contract's requirements.

### III.  CONCLUSION

For the reasons set forth above, the court **DENIES** plaintiff's motion for partial summary judgment.  By **no later than Monday, September 19, 2011**, the parties shall file a joint status report suggesting further proceedings in this case.  The court will notify the parties when it is prepared to hear argument on the pending dispositive motions in the St. Petersburg case.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge
